## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DIANNE K. VAN ROSSUM,       *

    **Plaintiff**            *

    **v.**               *          CIVIL NO. JKB-14-115

BALTIMORE COUNTY, MARYLAND,   *

    **Defendant**          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM

Dianne K. Van Rossum ("Plaintiff") brought an action against her former employer, Baltimore County, Maryland ("Defendant"), alleging that Defendant (through its agents) violated provisions of the Americans with Disabilities Act ("ADA") of 1990, as amended, 42 U.S.C. §§ 12101 *et seq.*  Now pending before the Court is Defendant's Motion for Summary Judgment (ECF No. 59), filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The issues have been briefed (ECF Nos. 59–1, 60 & 61), and no hearing is required, *see* Local Rule 105.6 (D. Md. 2014).  For the reasons explained below, Defendant's Motion will be DENIED.

### I.   *Overview[1]*

#### A.   *Factual Background*

Plaintiff joined Defendant's workforce in 1980 as a full-time Sanitarian I—a community health inspector—in what would become known as the Department of Environmental Protection

---

[1] The facts and the inferences to be drawn therefrom are taken in the light most favorable to the party opposing summary judgment—in this case, Plaintiff.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

and Resource Management ("DEPRM").  (ECF No. 59–6 at 4.)[2]  In 1983, Plaintiff was promoted to Sanitarian II, and in 1991 she became a Food Plans Review Specialist ("FPRS"). (*Id* at 5.)  In that latter capacity, Plaintiff was responsible for reviewing blueprints and conducting inspections to ensure that food-service and swimming-pool facilities (and associated operational practices) complied with applicable codes, regulations, and standards.  (ECF No. 59–2 at 3.)  Beginning in the mid-1990s, Plaintiff conducted her FPRS administrative tasks from an office on the fourth floor of the county courthouse located at 401 Bosley Avenue in Towson, Maryland.  (ECF No. 59–6 at 4, 7.)

In May 2009, Plaintiff began experiencing a variety of symptoms—including severe pain and pressure, reduced vision, numbness, and "brain fog"—that she attributes to the presence of mold and fungus in the courthouse.  (*Id.* at 9, 11.)  Shortly thereafter, the DEPRM moved a few blocks down the road to the Jefferson Building located at 105 West Chesapeake Avenue, where Plaintiff was again provided an office on the fourth floor.  (*Id.* at 11.)  Unfortunately, Plaintiff's symptoms worsened, due—she suspects—to "environmental triggers created by off-gassing of new construction materials in the furniture and carpeting" as well as poor ventilation in her workspace.  (ECF No. 59–5 at 1.)[3]  Plaintiff requested an accommodation, and she was eventually relocated to the third floor (which was primarily occupied by the Department of Recreation and Parks ("DRP")), at which point her symptoms "lessened."  (ECF No. 59–6 at 15.)

In January 2010, Plaintiff learned that the DRP required her third-floor office space and that she would need to move yet again.  (*Id.* at 19, 21.)  "[K]nowing how the county works, [Plaintiff] really felt that they were going to put [her] back on the fourth floor."  (*Id.* at 19.)  She

---

[2] Evidently, the DEPRM no longer exists, its functions having been reallocated to the Department of Environmental Protection and Sustainability and the Department of Health.  (ECF No. 28 ¶ 3.)
[3] Plaintiff's physician, Dr. Lauren Richter, described Plaintiff's condition as "multiple chemical sensitivities being triggered by 'sick building syndrome.'"  (ECF No. 59–5 at 2.)

thus preemptively submitted a medical leave request pursuant to the Family and Medical Leave

Act ("FMLA") of 1993, as amended, 29 U.S.C. §§ 2601 *et seq.* On the FMLA form, Plaintiff

requested intermittent leave extending from January 21, 2010, through October 2011.  (ECF No.

59–7 at 1.)  In her deposition, Plaintiff clarified that these dates were "pretty arbitrary" and that

she was "hoping [she] wasn't off work at all . . . when [she] filled this out."  (ECF No. 59–6 at

18.)[4]  Following Plaintiff's submission, her manager, William Clarke, reassigned her to "field

sanitarian" duty (equivalent to the work she performed before she was promoted to an FPRS in

1991) and scheduled her for a "Fitness for Duty" medical evaluation with Dr. Peter Oroszlan,

M.D.  (ECF No. 59–9 at 1 & 59–10 at 1.)[5]  Clarke also advised Plaintiff that "temporary

provisions for the entry of [her] inspection data [would] be made in order that [she] [did] not

have to come into the office."  (ECF No. 59–9 at 1.)[6]

Plaintiff completed her medical evaluation, and on March 8, 2010, Dr. Oroszlan issued

his report.  He opined that the "available medical records . . . and the medical history do not

---

[4] In its memorandum in support of summary judgment, Defendant highlights Dr. Richter's advisement on the January 2010 FMLA form that Plaintiff was "unable to perform any of her duties in her present environment" and that she would require a reduced work schedule for sporadic treatments.  (ECF No. 59–7 at 6-7.)  Taken at face value, Dr. Richter's statements may lend credence to Defendant's theory, discussed *infra*, that Plaintiff was incapable of performing her essential duties and that Defendant therefore could not be liable for ADA violations.  However, in her deposition, Plaintiff insisted that she told Dr. Richter "exactly" what she told defense counsel—that she "anticipated [her] accommodation being taken away and being moved to the fourth floor, where [she] could not do the essential functions of [her] job."  (ECF No. 59–6 at 19.)  While a jury might well take Dr. Richter's statement into account in determining whether the third-floor office was, in fact, a viable accommodation for Plaintiff, the Court will not disregard sworn testimony or embark on an evidence-weighing misadventure at the summary-judgment stage.

[5] It is not clear whether Plaintiff's reassignment to field-sanitarian duty could itself be deemed a reasonable accommodation in consideration of her heightened environmental sensitivities.  In her Amended Complaint, Plaintiff characterizes the reassignment as a "demotion" and as evidence of Defendant's alleged retaliation in violation of the ADA.  (ECF No. 28 ¶ 50.)  And the summary-judgment record includes an interoffice correspondence, signed by Plaintiff, through which she initially rejected the proposed reassignment (in part because the proposal would have required her to spend a limited amount of time performing data-entry tasks on the fourth floor).  (ECF No. 59–8.)  But in her deposition, Plaintiff denied telling her superiors that she could not do field inspections; while she considered fieldwork "more physically demanding" than FPRS duty, her "main concern was the fourth floor time" that the job would have required.  (ECF No. 59–6 at 22.)  Plaintiff further acknowledged that she "would have been willing to do . . . the field sanitarian inspections if there was an accommodation where [she] could have entered . . . data . . . but not on the fourth floor."  (*Id.* at 25.)

[6] Plaintiff elaborated that one of her supervisors, Angela Sutherland, would meet Plaintiff on the ground level of the Jefferson Building, retrieve her reports, and then enter the data on her behalf.  (*Id.* at 23.)

support any particular past or current ongoing organic health related problems that could explain [Plaintiff's] symptoms [*sic*]" and that there was "no medical basis to attribute her symptoms to . . . new carpeting, furniture or recently painted areas." (ECF No. 59–10 at 6.)  Dr. Oroszlan concluded that Plaintiff's current and claimed symptomatology did "not prevent her from performing all the job related functions of her classification, including the time she needs to spend in her office, safely, effectively, and reliably, without undue harm to herself and others." (*Id.*)  In light of Dr. Oroszlan's findings, Clarke issued a memorandum dated March 29, 2010, informing Plaintiff that, effective immediately, she was to report daily to her assigned office. (ECF No. 59–11 at 1.)  Plaintiff spoke with Clarke about the memorandum and told him that she could not work on the fourth floor; he advised her that she would face disciplinary action if she did not comply with his directive.  (ECF No. 59–6 at 25.)[7]

Following her conversation with Clarke, Plaintiff submitted a second FMLA request (ECF No. 59–12); she exhausted her remaining leave time, and she then notified Clarke of her retirement effective April 22, 2010 (ECF No. 59–13).  Plaintiff would have become entitled to full retirement benefits had she remained employed through July 30, 2010; because of her early departure, she forfeited certain pension and related benefits.  (ECF No. 59–6 at 27-29.)

On July 28, 2010, Plaintiff applied for Social Security Disability Insurance ("SSDI"). (ECF No. 59–14 at 20.)  In support of her application, Plaintiff averred that she became "unable to work because of [her] disabling condition on March 26, 2010." (*Id.*)  Plaintiff testified at a hearing before an administrative law judge ("ALJ") on October 18, 2012. (*Id.* at 12.)  On March 21, 2013, the ALJ issued a decision finding Plaintiff disabled within the meaning of the Social

---

[7] However, Carmela Iacovelli, another DEPRM employee who had also experienced symptoms while working on the fourth floor, was accommodated with an office on the first floor.  (ECF No. 60–12 at 5-6.)  Unlike Plaintiff, Iacovelli was never required to undergo a Fitness for Duty medical evaluation.  (*Id.* at 6.)

Security Act as of March 26, 2010 (*id.* at 19), and Plaintiff was thereafter awarded monthly SSDI benefits (*id.* at 3).

### B.   Procedural History

In May 2010, Plaintiff filed a charge of discrimination (No. 531-2010-01326) with the Equal Employment Opportunity Commission ("EEOC"), accusing Defendant of violating the ADA and other federal law.  (ECF No. 28 ¶ 8.)  On March 19, 2013, the EEOC determined that the DEPRM violated the ADA by (1) failing to engage in an interactive process to address Plaintiff's disability; (2) denying Plaintiff a reasonable accommodation; (3) reassigning Plaintiff to field-sanitarian duty; and (4) forcing Plaintiff to retire prematurely.  (ECF No. 28–2 at 3.)  Agency conciliation efforts failed (ECF No. 28–3 at 2), and the EEOC issued a right-to-sue letter on October 17, 2013 (ECF No. 28–5 at 2).

Plaintiff filed suit on January 15, 2014 (ECF No. 1); she filed her First Amended Complaint on August 27, 2014 (ECF No. 28).  Plaintiff alleges that Defendant violated the ADA through failure to provide a reasonable accommodation (Count I), retaliation and coercion (Count II), and disparate treatment (Count III).   Defendant filed the pending Motion for Summary Judgment on November 20, 2015 (ECF No. 59); Plaintiff opposed Defendant's Motion (ECF No. 60), and Defendant replied (ECF No. 61).  The matter is ripe for decision.

## II.   Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of his case as to which he would have the

burden of proof. *Celotex Corp.*, 477 U.S. at 322-23. The "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Even so, the opponent may not rest upon the mere allegations or denials of his pleading but must instead, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits must be made on personal knowledge with such facts as would be admissible in evidence and must affirmatively show the competence of the affiant to testify to the matters stated therein. Fed. R. Civ. P. 56(c)(4).

## III. Analysis

Title I of the ADA bars any "covered entity"[8] from discriminating against any qualified individual on the basis of disability with respect to the terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). Title V, in turn, makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by [the ADA]." § 12203(b). These protections extend only to "qualified" individuals—*i.e.*, individuals who can perform the essential functions of their positions with or without "reasonable accommodation." § 12111(8).[9] Plaintiff here maintains that she was a qualified individual because she was "capable of working with a reasonable accommodation at

---

[8] The term "covered entity" includes most employers that (1) are engaged in an industry affecting interstate commerce and (2) have fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. 42 U.S.C. § 12111(2), (5)(A). Defendant acknowledges that it is a covered entity. (*See* ECF No. 29 at 1.)

[9] The ADA defines "reasonable accommodation" to include facility adaptation, job restructuring, reassignment to a vacant position, acquisition or modification of equipment, adjustment to training materials, and similar accommodations. § 12111(9).

the time the County wrongfully revoked that accommodation and forced her into retirement."
(ECF No. 60 at 14.)

In its Motion for Summary Judgment, Defendant contends that Plaintiff is "judicially estopped from maintaining her present ADA lawsuit while at the same time receiving monetary benefits pursuant to an award of SSDI," ostensibly because Plaintiff's statements in connection with her SSDI application appear inconsistent with her present litigating position.  (ECF No. 59–1 at 12-13.)   Defendant's logic may have superficial appeal:   the Fourth Circuit has acknowledged that judicial estoppel may be appropriate where (1) the party to be estopped asserts a position that is factually incompatible with a position taken in a prior proceeding; (2) the prior position was accepted by that tribunal; and (3) the party has taken such inconsistent positions for the purpose of gaining an unfair advantage.  *King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998).

However, the Court need not rely on general equitable principles to resolve the dispute here, because the Supreme Court has provided clear guidance with respect to the SSDI/ADA scenario.  In *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 797-98 (1999), the Court held that the "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim" and that the law does not "erect a strong presumption against the recipient's success under the ADA."  On the contrary, there are "many situations in which an SSDI claim and an ADA claim can comfortably exist side by side."  *Id.* at 803.  As the Court explained, "when the [Social Security Administration ("SSA")] determines whether an individual is disabled for SSDI purposes, it does *not* take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI."  *Id.*  Nevertheless, the Court recognized that, in

some cases, a prior SSDI claim may genuinely conflict with an ADA claim; accordingly, the Court held that "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim" but must instead "proffer a sufficient explanation" from which a reasonable juror could conclude that—assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement—the plaintiff could have performed her essential duties with or without a reasonable accommodation.  *Id.* at 805-07; *see also Lee v. City of Salem*, 259 F.3d 667, 674 (7th Cir. 2001) ("*Cleveland*'s analysis suggests that an ADA plaintiff may not, simply by disavowing a prior claim of total disability, perform an about-face and assert that he is a 'qualified individual' who is capable of working.  Rather . . . the plaintiff must proceed from the premise that his previous assertion of an inability to work was true, or that he in good faith believed it to be true, and he must demonstrate that the assertion was nonetheless consistent with his ability to perform the essential functions of his job.").

Following *Cleveland*, courts in this Circuit and nationwide have allowed plaintiffs to litigate ADA claims in spite of facially inconsistent statements rendered in the SSDI and analogous contexts, so long as such litigants proffer sufficient explanations for their inconsistencies.  *See Fox v. Gen. Motors Corp.*, 247 F.3d 169, 178 (4th Cir. 2001); *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379-80 (4th Cir. 2000); *EEOC v. Denny's, Inc.*, Civ. No. WDQ-06-2527, 2010 WL 2817109, at *8-9 (D. Md. July 16, 2010); *see also Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013); *Solomon v. Vilsack*, 628 F.3d 555, 567 (D.C. Cir. 2010); *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 105 (2d Cir. 2010); *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 610 (3d Cir. 2006); *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 485 (5th Cir. 2001); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 335 (2d Cir. 2000).[10]

---

[10] In its memorandum in support of summary judgment, Defendant cites several post-*Cleveland* cases in which courts granted (or upheld) summary judgment to defendant-employers.  However, these cases are readily

*Cleveland* and progeny control the Court's analysis here.  While Defendant makes much of Plaintiff's July 28, 2010, admission that she "became unable to work because of [her] disabling condition on March 26, 2010" (ECF No. 59–14 at 20), that admission must be read in the context in which it appears—an SSDI application, for which the possibility of reasonable accommodation has no bearing.  *See Turner*, 440 F.3d at 610 ("As discussed in *Cleveland*, [a] statement of inability to work must be read as lacking the qualifier of reasonable accommodation . . . . Thus, in her SSDI application, [plaintiff] was saying, in effect, 'I am unable to work without reasonable accommodation.'  This statement is not inconsistent with her ADA claim, in which she is saying, in effect, 'I am able to work *with reasonable accommodation*.'").[11]

---

distinguishable from the instant case.  In *EEOC v. Greater Baltimore Medical Center, Inc.*, 477 F. App'x 68, 75-76 (4th Cir. 2012), the Fourth Circuit affirmed the district court's grant of summary judgment to a former employer where the employee had been medically released for work *after* he secured SSDI benefits—a fact he never conveyed to the SSA—and where the employee testified that he believed he could have performed his essential duties *without* an accommodation.  The court concluded that the employee "could not have maintained a good faith belief in his ability to return to work *without reasonable accommodation* [while] simultaneously believ[ing] that he had no obligation to inform SSA of the change in his condition."  *Id.* at 75-76.  In *Swanson v. Medical Action Industries, Inc.*, 343 F. Supp. 2d 496, 500-01 (W.D.N.C. 2004), the district court granted summary judgment to a former employer whose employee (1) admitted he could not have performed the physical functions of his job, (2) opined that he "possibly" could have performed the supervisory functions, but (3) provided "no explanation of how he could [have done] so while in constant pain requiring substantial medication which impair[ed] both his memory and ability to think clearly."  Finally, in *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 57-59 (4th Cir. 2002), the Fourth Circuit affirmed the district court's grant of summary judgment to a former employer where the employee "concede[d] that at the time of the employment decision . . . he could not perform full-time work" and where a part-time position was not a reasonable accommodation under the circumstances.

Taken together, these cases stand for two propositions:  (1) courts will not permit ADA litigants who appear to have misrepresented their disabilities before the SSA to profit further from their dishonesty; and (2) ADA litigants may not simply allege that they could have performed their essential duties with reasonable accommodation but must instead support such allegations with admissible evidence.  There is no indication that Plaintiff here acted deceitfully—and there is sufficient evidence to create at least a triable question of fact as to whether Plaintiff could have performed her duties with an appropriate accommodation (*i.e.*, an office space that did not make her sick).  Consequently, *Greater Baltimore Medical Center*, *Swanson*, and *Lamb* are inapposite.

[11] In its reply brief, Defendant points out that William Clarke's memorandum (directing Plaintiff to return to her fourth-floor office) was dated March 29, 2010.  Defendant thus posits that, by her own admission, Plaintiff was "unable to work because of [her] disabling condition" three days prior to the adverse employment action.  (ECF No. 61 at 4-5.)  "Plaintiff's own words," Defendant writes, "condemn her claim under the ADA."  (*Id.* at 5.)

The Court disagrees.  As the Court has explained, Plaintiff's SSDI admission must be read in legal context, so Defendant's parsing of dates does little to advance its position.  Moreover, Plaintiff explained on deposition why she chose March 26, 2010, as her proposed disability onset date:  that date, a Friday, was her "last full day of employment."  (ECF No. 59–6 at 30.)  The following Monday, Plaintiff learned that her accommodation had been rescinded effective immediately and that she was expected to return to the fourth floor; she declined to do so, choosing instead to use up her remaining leave time and, ultimately, to retire.  Given that sequence of events, the Court does not find Plaintiff's March 26 onset date inconsistent with the claims she is advancing in this lawsuit.

Defendant urges that factual assertions appearing in two Social Security Adult Function Reports ("AFRs")—one submitted on September 8, 2010, and the other submitted on March 25, 2011—are incompatible with Plaintiff's ADA claims.  In the September 2010 AFR, Plaintiff admitted that her "cognitive functioning ha[d] been substantially impaired, affecting memory, concentration, understanding and following instructions," and that her "[p]hysical activities ha[d] been reduced from pain and fatigue." (ECF No. 59–14 at 36.)  Read in isolation, such statements may seem inconsistent with Plaintiff's contention that, at the time of her retirement, she could have performed her essential duties with an appropriate accommodation.[12]  But the Court need not read these statements in isolation, because *Cleveland* entitles Plaintiff to explain any facial inconsistencies between averments she made before the SSA and assertions she makes in these proceedings.  And Plaintiff has done just that:  in her deposition, she attested that "by April of 2010, when [she] knew the county was forcing [her] out of [her] position, and [she] was losing [her] retirement . . . the stress that [she] was under exacerbated [her] symptoms so greatly that it was very difficult for [her] to work." (ECF No. 59–6 at 33.)  She added that her "health went downhill after [her] livelihood [was] just ripped out from under [her]." (*Id.* at 37.)  A reasonable jury could certainly conclude that one's health might decline (perhaps precipitously) in response to a traumatic job loss and the attendant economic hardship.  Thus, Plaintiff's representations in her September 2010 AFR—executed nearly six months after her purportedly forced retirement— are insufficient grounds for judicial estoppel.[13]  *See Cleveland*, 526 U.S. at 805 ("[T]he nature of

---

[12] On the other hand, in the same September 2010 AFR, Plaintiff recounted that she handled her own cleaning and laundry; that she could drive alone, pay bills, and manage a savings account; and that she shopped two or three times weekly. (ECF No. 59–14 at 33-34.)  Such averments suggest that, as of September 2010, Plaintiff might have been capable of performing such work-related tasks as data entry, driving a company car, and/or visiting restaurant facilities for inspections.

[13] As for the March 2011 AFR, that document is even further in time from the adverse employment action here. Moreover, the 2011 AFR was executed by Plaintiff's counsel—an independent reason why that document should not give rise to estoppel.  *See Floyd v. Mount Sinai Med. Ctr. Pers. Dir.*, No. 04 Civ. 556(NRB), 2005 WL 2174001, at *2 n.2 (S.D.N.Y. Sept. 8, 2005) ("[J]udicial estoppel has only been applied when the record contains factual

an individual's disability may change over time, so that a statement about that disability at the time of an individual's application for SSDI benefits may not reflect an individual's capacities at the time of the relevant employment decision."); *Smith*, 727 F.3d at 957 ("There is no inconsistency between being totally disabled at a particular point in time and in not being totally disabled at [another] point in time.").

In light of the foregoing, the Court holds that Plaintiff's statements made in connection with her SSDI application do not bar her from prosecuting her ADA claims here.  This is not to suggest, of course, that Plaintiff's statements (or, for that matter, other documents relating to the SSDI proceedings) are irrelevant in this litigation.  On the contrary, such statements and documents, along with other evidence adduced at trial, might persuade a jury that Plaintiff was unable to perform her essential duties at the time of her departure from county service.  *Cf. Solomon*, 628 F.3d at 567 (warning that, while plaintiff's statements made in support of a disability-benefits application did not foreclose her Rehabilitation Act claim under *Cleveland*, a jury "might well be skeptical" of plaintiff's claim in light of those statements).  But the Court cannot make such a determination at the summary-judgment stage, because there is sufficient evidence in the record from which a reasonable jury could alternatively conclude that Plaintiff was capable of performing her duties with an appropriate accommodation.[14]

statements *made by the claimant* that directly contradict the claimant's later ADA claims." (emphasis added)).  For a similar reason, the ALJ's summary of his findings and of the medical evidence he reviewed, while potentially relevant to a jury's determination as to Plaintiff's fitness for duty, is insufficient grounds for judicial estoppel. *Cf. Murphey v. City of Minneapolis*, 358 F.3d 1074, 1079 (8th Cir. 2004) ("We hold . . . that [a] physician's opinion does not amount to a 'sworn statement' or representation [by the plaintiff] that he is totally and permanently disabled and unable to work.").

[14] Aside from Plaintiff's testimony that she was "able to perform all [her] tasks" while located on the third floor of the Jefferson Building (ECF No. 59–6 at 15) and that she would have been willing to conduct field inspections so long as she was not required to work on the fourth floor (*id.* at 25-26), the record contains corroborating testimony from Plaintiff's superiors.  John Markley, a manager in charge of all operational and personnel matters for the DEPRM, testified that, to his knowledge, Plaintiff performed all of her essential functions while she was stationed on the third floor; he was aware of no complaints concerning the quality of her work product.  (ECF No. 60–6 at 6.)  Yvonne DeLoatch, a supervisor, also acknowledged that she was aware of no complaints concerning Plaintiff's work.  (ECF No. 60–8 at 3.)  And Angela Sutherland, the supervisor who entered Plaintiff's data after she returned

## IV.  *Conclusion*

For the reasons stated herein, an Order shall enter DENYING Defendant's Motion for Summary Judgment (ECF No. 59).

DATED this 4th day of April, 2016.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge

---

from field inspections, affirmed that Plaintiff's work was satisfactory.  (ECF No. 60–9 at 5.)  Defendant has adduced no offsetting evidence tending to show that Plaintiff's work was defective.  That Plaintiff appears to have performed adequately throughout the accommodation period bolsters her argument that she could have continued performing her essential duties had Defendant maintained that accommodation or offered an acceptable alternative.